## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TERRA JOHNSTON,** | ) | **CIVIL ACTION NO.  2:21-cv-1536** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BOROUGH OF AVALON,** | ) | |
| | ) | |
| **Defendant.** | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

### I.      PRELIMINARY STATEMENT

By this action, Plaintiff, Terra Johnston, seeks wage loss, compensatory and punitive damages, costs, attorneys' fees, pre and post-judgment interest because the Borough of Avalon has used and continues to use physical fitness tests to screen and select applicants for Full-Time Police Officer positions. Through the use of these physical fitness tests, Defendant has engaged in a pattern or practice of employment discrimination disparately impacting women in the selection of Full-Time Police Officers in violation of Title VII of the Civil Rights Act of 1964 42 U.S.C. §2000, *et. al*. Additionally, Defendant discriminated against Plaintiff due to her gender, a violation of Title VII of the Civil Rights Act of 1964 42 U.S.C. §2000, *et. al.* by failing to hire her as a Full-Time Police Officer, by treating her differently than her male peers and by terminating her employment. Plaintiff also seeks the same remedies as a result of Defendant's termination of her employment in retaliation for her complaints of gender discrimination in violation of Title VII of the Civil Rights Act of 1964 42 U.S.C. §2000.

## II.    JURISDICTION

1.      This Court has jurisdiction of this matter by virtue of 28 U.S.C. § 1331, in that this is a civil action wherein the matter in controversy arises under the laws of the United States.

2.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that this is a civil action in which jurisdiction is not founded solely on diversity of citizenship, and the acts constituting a substantial part of the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

3.      On November 25, 2021, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") against Defendant, alleging sex discrimination and retaliation.   Plaintiff dual filed her charge with the Pennsylvania Human Rights Commission (hereinafter "PHRC").[1]

4.      The EEOC issued a Notice of Right to Sue Letter to Plaintiff on July 28, 2021. This Complaint has been filed within ninety (90) days of the Plaintiff's receipt of the letter, thus making this action timely.

## III.    PARTIES

5.      Plaintiff is Terra Johnston (hereinafter "Officer Johnston"), an adult individual who resides in Aliquippa, PA.

6.      Defendant the Borough of Avalon (hereinafter "Avalon") is a city within the Commonwealth of Pennsylvania with an address of 640 California Avenue, Avalon, Pittsburgh, Pennsylvania, 15202.

7.      At all relevant times, Avalon is an employer within the definition of Title VII.

---

[1] Once the administrative requirements have been exhausted, Plaintiff intends to amend this Complaint to include two additional counts under the PHRA.

8.     At all relevant times, Officer Johnston was an employee of Avalon within the definition of Title VII.

### VI.     STATEMENT OF CLAIM

**A. Introduction**

9.     On or about July 20, 2020, Avalon hired Officer Johnston as a part-time police officer.

10.     Officer Johnston was an excellent part-time police officer who received praise from other officers she worked with.

11.     As a part-time police officer, Officer Johnston's duties consisted of maintaining a community presence through regular patrols, securing crime scenes and protecting evidence, attending public events as security, identifying criminal acts, issuing citations for traffic and similar violations, apprehending those suspected of committing crimes, and writing daily reports of activities. The above listed duties of part-time police officers are the exact same duties for full-time police officers (hereinafter "Police Officer Duties").

12.     The differences between Avalon part-time police officers (hereinafter "Part-Time Police Officer") and full-time police officers (hereinafter "Full-Time Police Officer") are as follows:

      a.   Full-Time Police Officers work more hours.

      b.   Full-Time Police Officers are entitled to additional job benefits such as health insurance.

      c.   Full-Time Police Officers are permitted to join the union, Avalon Police Association, and enjoy the protections of the collective bargaining agreement.

      d.   Full-Time Police Officers are paid additional compensation.

e. Full-Time Police Officers are required to take and pass a physical agility test.

    i. Part-Time Police Officers are not required to take or pass a physical agility test.

    ii. Officer Johnston did not take a physical agility test as a part of her application to be a Part-Time Police Officer.

13. Throughout her employment with Defendant as a Part-Time Police Officer, Officer Johnston worked the same shifts as Full-Time Police Officers.

14. Throughout Officer Johnston's employment with Defendant, some shifts were staffed entirely by Part-Time Police Officers.

15. Throughout her employment with Defendant as a Part-Time Police Officer, Officer Johnston worked with patrol partners that were both Full-Time and Part-Time Police Officers.

16. On or about July 31, 2017, to enter Police Academy training, Officer Johnston took and passed the Municipal Police Officers' Education and Training Commission (hereinafter "MPOETC") recommended norms and protocols for assessing and testing an applicant's physical fitness level (hereinafter "Cooper Health-Based Test")[2].

17. In or around July 2018, Officer Johnston again took the Cooper Health-Based Test upon graduation.

18. Officer Johnston is Act-120 Trained. Act-120 Training is designed to provide students with the skills necessary to begin their careers as police officers and is required by MPOETC for all Pennsylvania municipal police officers.

---

[2] *available at https://mpoetc.psp.pa.gov/training/Pages/Physical-Fitness.aspx* (last visited 9/16/2021)

**B. Avalon's Physical Agility Test Has a Disparate Impact on Female Full-Time Police Officer Candidates  and s Direct Discriminatory Impact on Plaintiff**

19.     On or about September 2, 2020, Officer Johnston applied to become a Full-Time Police Officer with Defendant.

20.     The application, according to Defendant's website, for Part-Time and Full-Time Police Officers is the same.[3]

21.     According to Defendant's policies, Full-Time Police Officer applicants must pass an examination that includes a physical agility test, written examination, oral examination, and background investigation before they can become a Full-Time Police Officer.

22.     Full-Time Police Officer applicants are required to first take a physical agility test (hereinafter "Physical Agility Test") before they can move forward with other aspects of the Full-Time Police Officer application.

23.     The Physical Agility Test is a pass/fail test. If an applicant fails the Physical Agility Test they are not permitted to move forward with their application.

24.     The Physical Agility Test includes, in no particular order: stretcher carry (timed), running (timed), stimulated body drag (timed), six foot high jump, and a thirty second trigger pull.

25.     The Physical Agility Test jump portion requires an applicant to "climb through a six (6)-foot high-level window without assistance to a three-foot level platform on the other side of the window, and then to the ground. Applicants then circle around a marker twenty (20) feet beyond the window and return up the three (3)-foot high platform and out the window onto the ground below." Hereinafter "Window Climb."

---

[3] *avaliable at* http://www.boroughofavalon.org/home/jobopportunities.html (last visited 9/15/2021).

26.     Failing to pass any one of the sections results in a failure of the Physical Agility Test.

27.     The Physical Agility Test unfairly focuses on a candidate's upper body strength and height through the Window Climb, body drag and stretcher carry, which does not translate into better police officers.

28.     The Physical Agility Test times various upper body strength tests and that unfairly disadvantages female candidates.

29.     Women in the United States on average tend to be shorter than men and have less upper body strength. According to the United States Center for Disease Control the mean height for women in the United States between 2015-2016 is approximately five foot three inches and the mean height for men in the United States between 2015-2016 is approximately five foot seven inches.[4]

30.     Relying on a screening test for applicants that focuses on upper body strength and height disproportionately screens and excludes female applicants from becoming Full-Time Police Officers.[5]

31.     There are equally effective, less discriminatory alternative tests to the Physical Agility Test that would allow Avalon to assess Full-Time Police Officer applicants' physical abilities without relying heavily on upper body strength and height, thus disproportionately excluding female applicants. Many local, state, and federal agencies use non-discriminatory physical

---

[4] Mean Body Weight, Height, Waist Circumference and Body Mass Index Among Adults: United States, 1999-2000 Through 2015-2016, Cheryl D. Fryar, M.S.P.H., Deanna Kruszon-Moran, Sc.M., Qiuping Gu, M.D., and Cynthia L. Ogden, Ph.D, National Health Statistics Report No. 122, December 20, 2018 *available at https://www.cdc.gov/nchs/data/nhsr/nhsr122-508.pdf* (last visited 9/18/2021).
[5] Recruiting & Retaining Women: A Self-Assessment Guide for Law Enforcement, National Center for Women & Policing, Chapter 5 pg 64-67 *available at* https://www.ojp.gov/pdffiles1/bja/185235.pdf (last visited 9/18/2021).

assessment tests to determine a police officer applicant's physical ability. Including the following:

    a. Upon information and belief the City of Pittsburgh uses the MPOETC recommended Cooper Health-Based Test both for entrance to and exit from their academy. The Cooper Health-Based Test is gender and age normed and includes: a timed 300 meter run, bench press or push-ups, 1 minute of sit-ups, and a timed 1.5 mile run.[6]

    b. The Philadelphia Police use the MPOETC recommended Cooper Health-Based Test as a part of their police officer application.[7]

    c. Federal Bureau of Investigation (hereinafter "FBI") uses a Physical Fitness Test (hereinafter "PFT") that is gender normed and consists of four main events including: situps, timed 300-meter sprint, pushups, timed 1.5mile run, and maximum number of pullups.[8] In addition to being gender normed, the PFT allows applicants to be scored and permits a candidate who fails in the maximum number of pullups to still be considered. The Fourth Circuit upheld the PFT in *Bauer v. Lynch*, 812 F.3d. 340 (4th Cir. 2016).

32. The Physical Agility Test, and specifically the Window Climb, stretcher carry, body bag drag, is an unnecessary and unwarranted barrier to employment for Full-Time Police Officer female applicants, and specifically Officer Johnston.

---

[6] City of Pittsburgh, Event Descriptions for the Police Officer Recruit Physical Fitness Test *available at https://apps.pittsburghpa.gov/pcsc/MPOETC_Event_Descriptions.pdf* (last visited 9/16/2021)
[7] Agility Testing, Philadelphia Police, *available at* https://www.joinphillypd.com/hiringprocess/agility-testing (last visited 9/16/2021).
[8] *available at* https://www.fbijobs.gov/career-paths/special-agents/physical-requirements (last visited 9/18/2021)

33.     The Physical Agility Test violates the Uniform Guidelines on Employee Selection Procedures (1978)  as developed jointly by the Equal Employment Opportunity Commission and the United States Department of Justice by:

        a.  Violating §1607.3(a) which states: "*Procedure having adverse impact constitutes discrimination unless justified.* The use of any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any race, sex, or ethnic group will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated in accordance with these guidelines...." Upon information and belief, Avalon has not validated the Physical Agility Test under §1607.3(a).

        b.  Violating §1607.3(b) which states: "*Consideration of suitable alternative selection procedures.* Where two or more selection procedures are available which serve the user's legitimate interest in efficient and trustworthy workmanship, and which are substantially equally valid for a given purpose, the user should use the procedure which has been demonstrated to have the lesser adverse impact." Avalon does not use the Cooper Health-Based Test which has been demonstrated to have a lesser adverse impact on female applicants.

34.     As a part of her Full-Time Police Officer application, Officer Johnston took the Physical Agility Test on September 15, 2020 and passed the stretcher carry, body drag and timed trigger pull portions.

35.     On or about September 15, 2020, Officer Johnston, who is five-foot three-inches tall, was unable to complete the six foot high Window Climb and was disqualified from completing the rest of the Physical Agility Test.

36.     On or about September 15, 2020, a male applicant, Officer Scott Orndoff who is six-foot five inches tall, passed the test.

37.     On or about September 18, 2020, Avalon notified Officer Johnston via letter that she did not pass the Physical Agility Test. The letter states: "This letter is notification that you <u>did not</u> pass the agility portion for the Police Officer position at the Borough of Avalon. Unfortunately you are not eligible to proceed further with the application process."

38.     After September 18, 2020, Officer Johnston continued to work for Avalon as a Part-Time Police Officer and perform the same Police Officer Duties as Full-Time Police Officers.

**<u>B. Gender Discrimination and Sexual Harassment Directed Towards Officer Johnston</u>**

**<u>i. A Culture of Discrimination</u>**

39.     When Officer Johnston was hired on about July 20, 2020, she was the only female Part-Time or Full-Time Police Officer for Avalon.

40.     In or around July 2020, Avalon police department was extremely short staffed and did not have enough police officers.

41.     Chief Thomas Kokoski (hereinafter "Chief" or "Chief Kokoski") encouraged and participated in a culture that was demeaning and discriminatory towards women.

42.     Throughout Officer Johnston's employment, Chief Kokoski treated Officer Johnston differently based on her gender.

43.    On or about July 28, 2020 and August 3, 2020, Chief Kokoski asked Officer Johnston if she thought there were differences between male and female officers. Officer Johnston responded that there are some differences between male and female officers. Officer Kokoski pointed to a photo of his former partner who is male and small framed and explained that his partner did the job despite being small. Officer Kokoski seemed to indicate that because Officer Johnston was smaller than her male peers, she would have a harder time being a police officer.

44.    On or about August 10, 2020, Officer Johnston started her first day on the job as a Part-Time Police Officer.

45.    Starting on the first day and during Officer Johnston's time with the Avalon police, male officers were welcomed to use the lockers in the women's restroom, despite being equipped with lockers in the men's room. Officer Johnston was instructed to lock the door of the women's restroom entrance when going to the restroom.

46.    Officer Rossetti was one of Officer Johnston's training officers and the MPOETC firearms instructor.

47.    From the start of Officer Johnston's employment, Officer Rossetti treated Officer Johnston differently than her male peers.

48.    In or around late August 2020, Avalon hired two new male officers Markus Denapoli and Scott Orndoff. After hiring Officers Orndoff and Denapoli, Avalon was no longer short-staffed.

49.     Officer Denapoli has the same qualifications as Officer Johnston. Both officers graduated from the Police Academy and neither had worked as a police officer prior to joining Avalon.

50.     Officer Orndoff had lesser qualifications than Officer Johnston and was initially hired as an "intern" due to his inability to legally carry a firearm.

51.     On or about August 23, 2020, Officer Johnston was supposed to be trained by Officer Rossetti. However, Officer Rossetti refused to train her on traffic stops and left her with a non-training officer, Officer Impell. He instead spent the day training Officer Orndoff even though Officer Orndoff was not certified to go on calls with a high threat of violence.

52.     Officer Rossetti continued to refuse to train Officer Johnston on traffic stops even though he trained Officer Orndoff on traffic stops.

53.     On or about August 25, 2020, Officer Rossetti approved Officer Johnston to work on Juris Doctor program while on duty.

54.     Officer Johnston observed male peers watching television while on duty on multiple occasions.

55.     On or about September 9, 2020, Officer Panormios and Officer Johnston were on shift together. Officer Panormios had to help Chief Kokoski fix his JTAC certification and when he was finished he would help Officer Johnston with another certification. He told Officer Johnson to "keep herself busy" while he helped Chief Kokoski. At the time, there were no pending calls. Johnston began working on her Juris Doctor program. Chief Kokoski walked past Officer Johnston and asked her what she was doing. Officer Johnston responded that she

was working on homework. Chief Kokoski responded by yelling at her, "You're already making your way out of this fucking place, go learn the streets and don't fucking come back."

56.     After Officer Johnston left the station under Chief Kokoski's orders, Officer Panormios asked her to come back to the station and pick him up. Officer Johnston told Officer Panormios that she felt Chief Kokoski treated her differently.

57.     After Officer Johnston came back to the station, Chief Kokoski explained to her that while other male officers could "do what they want" on shift, she needed to take advantage of the time to become a better police officer.

58.     On or about September 9, 2020, Chief Kokoski treated Officer Johnston differently based on her sex by threatening to terminate her employment for engaging in the same activities as her male peers and by holding her to higher standard than her male peers.

59.     On or about September 9, 2020, Chief Kokoski, after yelling at Officer Johnston and discriminating against her because of her gender, told Officer Johnston while pointing at his heart, "You need to harden this up." Officer Johnston took this to mean that because she is female she had a "soft heart."

60.     On or about September 23, 2020, Officer Rossetti told a room full of officers including Officer Johnston that while having large fingers "sucks" for loading a gun, "it's good for putting two in the pussy and one in the ass."

61.     Officer Rossetti's comments were unwelcomed and Officer Johnston felt deeply uncomfortable.

## ii. Discriminatory Firearms Qualification

62.     On or about July 23, 2020, Officer Johnston met with Officer Rossetti to take the MPOETC Firearms Qualification Exam (hereinafter "Firearms Exam").

63.     The MPOETC requires all officers in the Commonwealth of Pennsylvania to take the MPOETC each year.

64.     On or about July 23, 2020, Officer Johnston passed the Firearms Exam with Officer Rossetti.

65.     On or about July 23, 2020, Officer Rossetti certified Officer Johnston's Firearms Exam results to the MPOETC, indicating to the Commonwealth Pennsylvania that she was qualified to carry her weapon.

66.      On or about August 10, 2020, Chief Kokoski told Officer Johnston that she would be joining the several other officers at the shooting range in September 2020 to practice her shooting skills.

67.     On or about September 2020, Officer Johnston signed up to go to the range with her colleagues as instructed by Chief Kokoski.

68.     Officer Johnston, based on her August 10, 2020 conversation with Chief Kokoski, believed that she was going to the shooting range to practice, not to requalify. She signed the qualification sheet only to ensure there would be enough ammunition for her to practice with given the nation's shortages on ammunition in the summer and fall of 2020.

69.     On or about September 23, 2020, Officer Johnston attended the range with Chief Kokoski, Officers Rossetti, Impell, Piccinini, DiCesare, and Denapoli.

70.     On or about September 23, 2020, Chief Kokoski ordered Officer Johnston to help Officer Rossetti to unload the car and publicly scolded her for chatting with the other officers, but did not order the male officers to help or publicly scold them.

71.     On or about September 23, 2020, Officer Johnston shot with all the others and assumed her test was a practice session based on her August 10, 2020 conversation with Chief Kokoski and because she had already qualified for the year. However, after the group finished shooting, Officer Rossetti stated that Officer Johnston, Officer Piccinini and Chief Kokoski failed the MPOETC Firearms Exam.

     a.  Officer Johnston was shocked, as she did not know she was taking the MPOETC Firearms exam.

     b.  After Officer Rossetti announced who passed and who failed, Chief Kokoski looked at Officer Johnston and stated: "I'm being both serious and literal when I say if you fail you don't have a fucking job."

     c.  After Officer Rossetti announced that Officer Johnston failed the MPOETC Firearms Exam, rather than offering assistance or tips on qualifying as he was the firearms instructor, he told Officer Johnston: "You ain't gonna fucking make it."

     d.  Officer Johnston took the MPOETC Firearms Exam for a second time but for the first time knowing that she was being tested.

     e.  Officer Johnston passed the first portion of the MPOETC Firearms Exam but not the second portion.

    f.   Officer Rossetti would not show Officer Johnston her raw scores nor would he let her see her target.

    g.   Officer Johnston was not permitted to shoot the MPOETC Firearms Exam a second time like the male officers who did not pass the MPOETC on the first round, including Chief Kokoski.

    h.   The MPOETC does not require officers to pass the MPOETC Firearms Exam within a certain number of attempts.

72.    On or about September 23, 2020, Chief Kokoski told Officer Johnston that she was suspended without pay and that she had two weeks to retake the MPOETC Firearms Exam and pass it on the first try with Officer Rossetti. If Officer Johnston did not pass, then her employment would be terminated.

73.    On or about September 23, 2020, Officer Johnston asked Chief Kokoski for additional ammunition for practicing for the MPOETC Firearms Exam given the national ammunition shortage.

74.    On or about September 23, 2020, Chief Kokoski responded that he would give her additional ammunition but failed to do so.

75.    Chief Kokoski allegedly suspended Officer Johnston because she could not carry a weapon. However, Chief Kokoski permitted Officer Orndoff to work as an "intern" before being qualified to carry a firearm on duty.

76.    Officers Orndoff and Denapoli were not required to retake the MPOETC Firearms Exam after qualifying.

77.     Officer Johnston did not retake the MPOETC Firearms Exam on October 7, 2020 as she felt it was a form of gender discrimination given that:

      a.   She had already qualified for the year on July 23, 2020.

      b.   She was not provided with access to a firearms instructor and Officer Rossetti refused to help her on September 23, 2020.

      c.   She did not have access to the shooting range because it was privately owned and operated. Additionally, commercial ranges were cost prohibitive given the national ammunition shortage during the relevant time period.

      d.   She was not provided with ammunition during the two week period and there was a national ammunition shortage that limited shooters to one box at the commercial range.

      e.   She only had one attempt to pass even though there is no limit on attempts to qualify.  Chief Kokoski and other officers had two attempts to pass.

78.     On or around June 8, 2021 and June 10, 2021, after she was terminated from Avalon, Officer Johnston hired a private instructor to go over the MPOETC Firearms Exam.  During her time with the instructor, Officer Johnston shot the various components of the MPOETC accurately.

**iii. Gender Discrimination Complaint to Avalon**

79.     On or about October 1, 2020, Officer Johnston requested a meeting with Avalon Mayor Mr. Lloyd, and City Council President Mr. Klicker due to the gender discrimination she faced in the Avalon police department.

80.     On or about October 3, 2020, Officer Johnston told Chief Kokoski that she felt he discriminated against her because of her gender and asked that she be reinstated with back-pay.

81.     On or about October 3, 2020, Chief Kokoski responded to Officer Johnston's gender discrimination complaint by calling it "an insult and ridiculous."

82.     On or about October 3, 2020, when she had not heard anything from Mr. Lloyd and Mr. Klicker, Officer Johnston again reached out and stated that she felt she was being discriminated against because of her gender.

83.     On or about October 9, 2020, Officer Johnston had a phone call with Daniel C. Conlon, Esq. and Mr. Klicker in which she again stated that she was being discriminated against due to her gender.  The Mayor of Avalon, Mr. Lloyd, did not participate in the call.

84.     On or about October 14, 2020, Chief Kokoski sent Officer Johnston a letter again requiring her to pass another MPOTEC Firearms Exam and dismissing her gender discrimination complaint.

85.     Avalon did not investigate Officer Johnston's discrimination complaint.

86.     On or about October 20, 2020, Officer Johnston responded to Chief Kokoski's letter disputing many of the allegations and again asking that she be treated like her male peers and not be discriminated against.

87.     On or about November 4, 2020, Chief Kokoski terminated Officer Johnston's employment with the Avalon for discriminatory reasons and in retaliation for bringing a gender discrimination complaint.

88.     The temporal proximity to Officer Johnston's discrimination complaints and her termination serve as evidence of causation.

89.     Upon information and belief, Officer Johnston was replaced by a male.

90.     The gender discrimination and retaliation Officer Johnston suffered while working for Defendant affected her self-esteem and caused her severe emotional distress.

91.     The Defendant's extreme and outrageous conduct warrants the imposition of substantial compensatory damages and punitive damages.

## V. CLAIMS FOR RELIEF

## COUNT I – VIOLATION OF Title VII - DISPARATE TREATMENT OF PLAINTIFF

92.     Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

93.     Defendant's conduct described above and herein constitutes gender discrimination and is a violation of Title VII in that Defendant uses a hiring test that while facially neutral results in a discriminatory hiring pattern due to the differences between males and females.

94.     Defendant's discriminatory conduct was used as a basis for employment decisions affecting Plaintiff.

95.     The conduct described above and herein was unlawful gender discrimination committed by Defendant's employees, servants and/or agents who had the effective ability to influence employment actions that could affect Plaintiff, including but not limited to the failure to hire Plainitff.

96.     As a direct and proximate result of Defendant's unlawful, willful, deliberate discrimination against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss wages and loss of benefits, harm to her reputation, adverse effects on her career and diminished earning capacity.

97.     As a direct and proximate result of Defendant's unlawful, willful and deliberate discrimination and harassment against Plaintiff, Plaintiff suffered from physical problems that included but are not limited to emotion distress.

98.     By reason of Defendant's unlawful, willful, outrageous and deliberate misconduct towards Plaintiff, Plaintiff is entitled to recover both compensatory and punitive damages in addition to actual damages.

99.     Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

### COUNT II – VIOLATION OF Title VII - GENDER DISCRIMINATION

100.    Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

101.    Defendant's conduct described above and herein constitutes gender discrimination and is a violation of Title VII.

102.    Defendant's discriminatory conduct was used as a basis for employment decisions affecting Plaintiff.

103.    The conduct described above and herein was unlawful gender discrimination committed by Defendant's employees, servants and/or agents who had the effective ability to influence employment actions that could affect Plaintiff, including but not limited to demotion, reduction in wages and  firing.

104.    As a direct and proximate result of Defendant's unlawful, willful, deliberate discrimination against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature,

including but not limited to loss wages and loss of benefits, harm to her reputation, adverse effects on her career and diminished earning capacity.

105.    As a direct and proximate result of Defendant's unlawful, willful and deliberate discrimination and harassment against Plaintiff, Plaintiff suffered from physical problems that included but are not limited to emotion distress.

106.    By reason of Defendant's unlawful, willful, outrageous and deliberate misconduct towards Plaintiff, Plaintiff is entitled to recover both compensatory and punitive damages in addition to actual damages.

107.    Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

## **COUNT III – VIOLATION OF TITLE VII - RETALIATION**

108.    Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

109.    Defendant has intentionally and willfully engaged in a series of unlawful acts in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

110.    Defendant intentionally retaliated against Plaintiff for opposing Defendant's gender discrimination as evidenced by, among other things, Defendant's actions and comments in October 2020, and the temporal proximity of the actions and comments to Plaintiff's termination of employment.

111.    By reason of Defendant's unlawful, willful, outrageous and deliberate misconduct towards Plaintiff, Plaintiff is entitled to recover both compensatory and punitive damages in addition to actual damages.

112.    Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Honorable Court will:

(a) Assume jurisdiction herein;

(b) Declare Defendant's conduct to be unlawful and an intentional violation of Plaintiff's rights;

(c) Issue a permanent injunctive relief prohibiting any the use of the discriminatory Physical Agility Test to disqualify female applicants;

(d) Award Plaintiff wage loss damages, including back pay and front pay, damages associated with the increased tax burden of any award, and lost fringe and other benefits of employment;

(e) Award Plaintiff compensatory damages under Title VII;

(f) Award Plaintiff punitive damages under Title VII;

(g) Award Plaintiff pre and post-judgment interest;

(h) Award Plaintiff costs and attorneys' fees; and

(i) Grant such other relief as the Court deems just and appropriate.

Respectfully Submitted,

*/s/ Rachel L. McElroy*
Rachel L. McElroy, Esq.
PA ID No. 321624

McElroy Law Firm, LLC
100 First Ave. #1010
Pittsburgh, PA 15222
Phone: 412-620-8735
rachel@mcelroylawfirm.com

Attorney for Plaintiff

22